May it please the Court, my name is Ellie Schilling and I'm here on behalf of Crystal Seafood. We would ask that this Court reverse the judgment of the District Court or in the alternative, remand the case so that the Court may hold an evidentiary hearing. But you didn't ask for an evidentiary hearing below, did you? The standard in these types of clawbacks is that if summary judgment is not proven, if the Special Master does not succeed in meeting his burden on summary judgment, then the Court may hold an evidentiary hearing thereafter. So because the Court ruled that they had presented sufficient evidence, then there was no evidentiary hearing. The Court basically concluded that an evidentiary hearing wasn't necessary. You asked for one. I believe so. I mean, that's sort of the process that's been set up, is that either the Special Master succeeds on summary judgment and there is no evidentiary hearing, or he does not, and then the Court will hold an evidentiary hearing. But you don't know. I mean, I did not do the briefing at the District Court, but that's my understanding. You're doing it right now. Yes. My understanding is that that's the process that the judge has set up. So it sort of is. Was failure to have an evidentiary hearing, are you claiming that that's an abuse of discretion per se? We're saying that the standard, it's a summary judgment standard that the Court is using. And so it's a de novo review for you guys in terms of whether the summary judgment was met. But because it was not, because the Special Master did not present, you know, enough evidence to show that there were no facts in dispute, then the Court should have held an evidentiary hearing. He should have denied summary judgment and held an evidentiary hearing. Is this part of the claims administration rules, or where do you find that rule about not having to ask for an evidentiary hearing? That's the, in terms of the settlement claims process that's been set up, and I'm sure that the claims administrator can speak to this more clearly, but it's my understanding in these clawback actions that that's the process, that the Special Master initiates a proceeding saying that there was fraud, and so that the claims should be clawed back. That's judged based on a summary judgment standard, and that, as I said, if the Special Master succeeds in showing that he has enough evidence that there weren't any facts in dispute, then the Court doesn't hold a hearing, which to me is I don't know where it's written that that's the rule. I mean, that's, I think that there's some of the early cases on this was like the Zerlot case is one of the early clawback cases that established this proceeding, this procedure, but I agree with you that I think it's problematic. When I came to this case, when this clawback came before the Court, that's the process that's been set. So there's no ability for me at the district court level or at the appellate court level to challenge that process. What I'm saying is that you're asking for a reversal, correct? Yes, correct. Or a remand so that an evidentiary hearing can be held? I think that Your Honors could rule either way, the reverse, or if you think that the Court should hold an evidentiary hearing, then, yes, it could be remanded. The way it has worked in that ---- But if we reverse outright, I mean, you seem to be saying the Court applied this summary judgment standard, which Judge Barbier clearly said he's applying summary judgment, whether that's the right procedure or not. So if we were to reverse that, why should that mean that they don't have a chance to go get a hearing and prove their case with ---- I think that's right. I mean, they could ---- I mean, the case is still the larger case is still pending at the district court. So, I mean, I think that like in any other case, if you reverse in summary judgment, they can move forward this claim anyway. You know, they can refile the clawback or you can remand it and the Court can hold an evidentiary hearing. However, sort of procedurally, either way, I think that that would make sense. But, you know, our position is that at this stage that the ---- that's the process that the court, the district court has chosen to use is the summary judgment proceeding. But in this case, there wasn't enough evidence for the special master to succeed on summary judgment. Specifically then, you know, the case in this ---- in this case, there's a contradictory record with disputed facts where differing interpretations of the documents are possible. And what the special master and the district court want to say is that the affidavit that was submitted as our evidence by Crystal, that it's blatantly contradicted by the record. But ---- The question is whether the business entity after May 10 but before December 31 had initiated or completed a liquidation of substantially all their assets. Is that right?  I mean, it's whether they did not identify themselves as a failed business when they knew ---- That's the prong the district court relied on. That's right. It's undisputed that they didn't declare bankruptcy. And so it's either if you ---- the other aspects of under the settlement agreement to be a failed business or if you ceased your operations or you liquidated substantially all of your assets. So if substantially all of the assets had been disposed of or liquidated, then it'd be a failed company. I mean, that's the definition, yes, under the settlement program. And that's one of the main sort of factual issues in dispute is that, you know, we presented evidence in the form of a sworn affidavit that they haven't substantially ---- they haven't liquidated substantially all of their assets. That they continue ---- I'm looking at the sworn ---- part of the sworn tax return. Okay. That was in April of 2010. And, you know, it has a number of schedules. And one of the schedules says description of property. And then it has stars before the words indicates disposed. And then it lists the equipment and the stars in front of all the equipment. Now, this is a sworn statement by the taxpayer. And also on another schedule it says the beginning of the tax year, 2010, the value of the assets were $2.6 million. And then at the end of the year it says zero. And that's also part of the sworn statement. I think we've got some pretty clear law that you can't refute a sworn statement with a simple affidavit. Now, how do you get around that? Well, so, I mean, I think that one of the cases cited by the district court is the Scott decision, the Supreme Court decision, which sort of outlines this example of when the evidence is blatantly contradicted by the record. And in that case, then, there was an affidavit by the plaintiff saying that he had not been driving in a manner that endangered human health. But then there was a videotape that showed him driving 85 miles per hour down the road, swerving on both sides of the, you know, yellow line, and forcing cars off of the street. So in that case then Scalia said that the court did not have to rely on the A visual fiction, I think, was what he said. And so instead, the court should rely upon the videotape. And there's other — Well, I agree. That's one of the cases. But there are other cases that say that a nonmovement, and I'm quoting, cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement without explaining that contradiction. I mean, we've got cases where someone gave a deposition and said one thing and then comes back with an affidavit trying to refute the deposition. I think that quote is applicable to that situation. Yes. You're right. There are several cases that, you know, for example, in the Kennett-Murray v. Bone case, which is a Fifth Circuit case, then there were two sworn statements that were in conflict, the deposition and the affidavit. But the court found that in that situation that it's really — that's really a credibility determination then. This blatantly contradicted-by-the-record standard is really more if you cannot possibly explain anything other than what the visual evidence shows. So in this situation, then, you know, if there are explanations why the tax returns may be incorrect, maybe the accountant made a mistake, a lot of their — Well, it wasn't given to the district court, though, as an explanation. Well, I mean, the affidavit was submitted with the opposition briefing. Many of those arguments about the tax returns were made in the reply brief. Then there was a sur-reply that, yes, made some arguments about, you know, that what the meaning that there were other discrepancies on that tax return in terms of saying that the land and buildings had been depreciated but no one disputes that Crystal didn't own the land. So there's reasons to think that maybe there are some errors in those tax returns. And because this was briefed sort of back and forth, back and forth, but there was never an evidentiary hearing, then there wasn't an ability for the judge to really address the credibility of those explanations. But if you just come in and the taxpayer comes in with just a borrowed statement that mistakes were made in the tax return without any corroboration, like something from the accountant or some other evidence, how does that refute a sworn statement? Well, I mean, I would argue that there is other evidence, such as there was photographs of the equipment that are included in the affidavit. I don't understand the relevance of that in refuting the sworn statement. Well, it's to show that Crystal, as an entity, continues to own that equipment, that it continues to be on the site and can be used at any time to process shrimp. So that at least tends to show, you know, it is sort of up for debate which is correct and which isn't, but that's sort of our position is that the evidence is in conflict. Well, that picture was taken and we don't know anything about the picture. Right. That's true. But, you know, in that situation, to me it seems to be less of a summary judgment-like standard and more that, you know, that we as the non-movement are being required to disprove the special master's case. If we come forward with evidence, a sworn statement that's been corroborated by things like photographs, and to say that we haven't entirely disproven their position, I think that that gets away from the summary judgment, you know, in terms of we've presented a genuine issue of material fact. There's also, in addition to the summary judgment issues, then there's also an issue, a major issue with piercing the corporate veil. Procedurally. What standing does Crystal have to appeal Tron's? Well, that's part of the problem is that, you know, the two, that Victor and Christopher were never made parties to this proceeding at the district court level. So how they could even appeal to, I mean, they may have been able to. The standard is not. It's very difficult to be able to intervene after a judgment for appeal purposes. A party who's not a party to the appeal can't have a judgment reversed. I don't know of a case that says that. Well, I mean, I don't see how the judgment could be validly entered against them when they were never made parties to the proceeding. They weren't named in the motion. You know, they didn't. What does Crystal care? Excuse me? What does Crystal care if they were named as liable parties? Well, I mean, they're the Crystal. I mean, you know, there is, to some degree, these are small family-owned companies. So, of course, there's a separate existence for the corporation and the principals, which is why they should have been named, so that then they could have had their own separate counsel. Excuse me? Or intervene. Yes. I mean, to me, then, the error lies from the way that the procedure was done from the beginning. You know, it sort of encourages. Well, maybe if someone goes to enforce it, you could defend by, or they could defend by saying we weren't parties, there's no preclusive effect, but how does that give us the authority to review a judgment when they're not before us? I'm running short on time, but I think, I mean, it shows sort of one of the many errors, I think, in the proceedings below, that very little evidence was presented in order to pierce the corporate veil, that they were never made parties to the proceeding to be able to defend themselves. And the sort of evidence that was presented is all exactly the same. It's all tied up, all in the same. The same sort of, you know, they made misstatements, supposedly, to the claims program, so then, therefore, that's enough to also pierce the corporate veil. So, you know, we would argue that that's another error in the judgment and that it's another reason that it should be reversed and can be sent back for, yes, further proceedings to, so they can be properly made parties and they can, you know, present evidence that would show the validity or not of piercing the corporate veil. Lastly, then, in terms of the elements of fraud themselves, then there was not clear and convincing evidence that, even if there was a misrepresentation, that Crystal knew that it was not an ongoing business at the time. And this, a lot of this goes to some of the issues about whether they had retained their assets or not. But assuming the facts in the light most favorable to the non-movement, if they still they, you know, they were selling shrimp after the oil spill, they retained their corporate charter, they had their processing equipment, they were continuing to pay their debts, they weren't declaring bankruptcy, that from the light that they were looking at their own business, they were an ongoing business that could resume operations at any time. But you wouldn't refute that third prong of the test, would you? If they did dispose of their assets, that meets the definition of a business that's closed. If they have, if they did dispose of all of their assets, then that would make them a failed business. Then whether they knew that at the time in terms of fraud, it's sort of two separate things in terms of the intent to defraud, then. I see my time is up. Yes, thank you. Mr. Pauw. Good afternoon, Your Honors. Gregory Pauw for Special Master Louis Free. And with me is Richard Stanley, who is Counsel for Claims Administrator Patrick Juneau. The District Court made no error below, and the judgment should be affirmed. And I believe that several of the questions that were asked by the panel really focused in on the elements of fraud that the District Court had before it that were presented. And much of the attention that's focused here is on this one issue of the ownership of some seafood processing equipment at the plant. But Judge Barbier's decision was really based on many more factors besides that to demonstrate that this was, in effect, a failed and absolutely out of business company by the time that it filed its claim. And remember that the only time period that's important in this claim is from the time immediately after the oil spill, May 1, 2010, to December 31, 2011. So whether or not Mr. Tran has an expectation that sometime in the future he may be able to open or that business conditions will improve is of absolutely no relevance to this claim form. The claim form asks for a very discrete period of time. And let's focus on that period of time, what Judge Barbier said. In that time period, right after the oil spill to December of 2011, it had been over a year since Crystal Seafood had last purchased shrimp or last processed shrimp. They last processed shrimp in 2009, April of 2009. And at that time period, the principal of the company went away to federal prison for program fraud in another disaster relief program. So he was in prison for that entire time period that's of relevance to the claim form, was not even available to be able to work in that time period. So what parts of the failed business definition did Judge Barbier, he clearly found the last one that they had a liquidation of substantially all of the assets. Did he also find that they seized operations and wound down? He did, sir. Where did he find that? He finds on page 9 of the district court's opinion, which is 2467 of the record here. He relies both on the prong of that they've wound down their business and that they misrepresented themselves as an ongoing business and not a failed business. And again, those factors that the court went over are clear. And one of the most important factors, before Mr. Tran went to prison, he had a large inventory of frozen shrimp that was caught before April of 2009. That frozen shrimp was sent to a processor in Florida and then liquidated over the time that he went to prison. By mid-August of 2010, that entire inventory of shrimp had been liquidated completely. There were no more shrimp. They had nothing left to sell. How did he find that in the record? Your Honor, that's in our initial moving papers. There was attachments of several invoices that sent shrimp to a company called FlorTech in Florida and then a number of checks that were made from that entity back to Crystal. It's on page 2252 of our record that establishes all of that, all those transactions. Before Mr. Tran went to prison, his own wife, in a letter before the district court in Texas, said that essentially all the business operations have ceased. In her own words, again, several months before the oil spill, she's explained that this is no longer an ongoing business. The tax returns, which Judge Davis had focused on, they're a sworn statement of themselves, but the claims form that a claimant presents to the claim center also says that all of the paperwork that a claimant presents to the program is true and correct to the best of their knowledge. So not only is it a sworn statement to the IRS, but it's also a sworn statement to the DHECC that those tax returns are accurate. And there's no mistake about what they mean. There's never been any contrary evidence presented to the district court of any other understanding of Mr. Tran or his tax accountant for what the term disposed means. The IRS guidance is clear as to what it means. It means that someone has sold or otherwise gotten rid of a piece of property. The tax return is consistent also with the profit and loss statement that the Crystal Company presented to the program, because that profit and loss statement shows that in April of 2010, they no longer have a depreciation expense on the profit and loss statement. So again, consistent with the tax returns and the treatment that that equipment gets there, they've stopped taking that depreciation expense. So all of this — I have a question about the procedure that's been set up here — Yes, sir. — that opposing counsel was asked about. You concede in your brief that it's essentially a summary judgment standard? We do, Your Honor. I think that it's a bit complicated in terms of how this is proceeding. I mean, the judge has equitable discretion overseeing the settlement to enforce the terms and remedy fraud, et cetera, right? He does. And under the Deepwater Horizon Settlement Agreement, paragraph 18.1, he has ongoing and exclusive jurisdiction of any disputes that arise even after a payment is made under the program. And that's the authority that we've relied on before the district court to bring several of these motions against claimants that made fraudulent claims before the program. And he has denied a number of them, and even in this one he found you didn't. He found there was a fact dispute on the argument you made about whether Crystal operated a physical facility on the Gulf. In the cases where he's denied your motions, have you then gone to a hearing to prove any of those up where he'd make credibility findings? We have not. There have been no hearings on any of the cases, and there have been — Because you've chosen not to pursue? I mean, what's happened to those? Well, Judge, the direction of this program was that we would search through claims to look for claims where there was some indicia of fraud. We would bring those to the district court's attention. But Judge Barbier, in his discretion under the program, said that he did not want to have this devolve into many hearings on whether or not there was fraud in the claims. So he asked us, as his investigator and a special master, to bring to him claims that met a summary judgment threshold. That is, no dispute that it's clear on the face of the documents that were presented to the program or other documentary evidence that we can gather that there's been some fraud committed on the program. But if it doesn't meet that standard, he doesn't want to have a two-hour hearing to listen to a couple witnesses and see who's telling the truth? We've never brought that directly to the judge, but so far in cases even where he has found that there's disputes of facts, we have not proceeded to a hearing. Well, if there's a dispute of facts, he just denies the motion, right? He does. He denies the motion as if it's a summary judgment motion. Your motions haven't been orally argued. None of them have been orally argued, correct. No evidentiary hearing and no oral argument. You just submitted on the paper. That's correct, Your Honor. In other words, if the judge found that the papers didn't clearly show fraud, then you gave up on the claim of fraud. Is that what I'm hearing? That's correct, Your Honor. And there have been cases where the judge found that we had not met the summary judgment standard or that the evidence was in equipoise and he decided not to grant the motion. We did not proceed. And you didn't appeal. We did not appeal. There have been several appeals that have been brought by other claimants. I noticed. I'm sure. Your Honor, there was also a mention of the issue of the affidavit that was filed that made a claim that this equipment, this processing equipment, was still owned by Crystal Seafood. And I would suggest that the Court take a look at the Copeland case, which I think is really the best authority for explaining the framework that the Court uses in these types of situations. This is a very well-supported motion. And as I said, there were many factors besides just the ownership of the equipment that led to the allegation that there had been fraud here. And all that was presented from Crystal's, for the most part, Crystal's own business records, not from outside information that the program was able to present. In response to that… One of the things you have to prove is intent. And you note, which of course is the case, that you can prove fraudulent intent circumstantially. Rarely does someone have an email saying, oh, I'm going to defraud this program. So you look at the circumstances, oh, they had this much benefit. They should have known all of this. But you're really in the posture of a plaintiff with a fraud claim. That's essentially the posture that's been set up. You're trying to prove fraud. And you're saying you can use that circumstantial evidence to essentially get judgment as a matter of law to say there's no fact dispute on intent? I mean, that just seems odd. Outside of this context, it just seems like it would be very difficult for a plaintiff to ever win summary judgment on fraudulent intent of a defendant. Correct. I think that that's probably generally true. The case that we cited to the court is the GE v. Chill case. And it actually sets out, I think, a good framework for determining whether or not there's sufficient pleadings to establish that there's a fraudulent intent. And we've relied on that framework to establish that. I think that part of what you can find in terms of the intent and the initiative intent of a claimant is the fact that they realize that by making these false statements and false representations of their business practice that they're in for the potential of a very large payout from the program. So that motivation in itself is a very strong indicia of intent of a claimant. I agree. I have no doubt a fact finder could find fraudulent intent based on that. But you're in the posture of saying as a matter of law, there's no dispute that they had that intent. That's what seems difficult for me. And I will say, again, this isn't in the court before on this record, but there have been other cases that Judge Barbier addressed where a claimant contested what his intent was in filing a form, and presented sufficient evidence to draw into question whether there was a disagreement or some misunderstanding. Here, I don't think that that took place. There's nothing in Mr. Tran's affidavit, and you can read through all the different places where he says that he owns this equipment, there's nothing in that affidavit that suggests that there's any confusion or mistake or anything that would give you an indication of how he came about ownership of this equipment. And that stands in contrast to an affidavit that one of his other companies, the lot company that owns all of this property, presented to the program. In the lot affidavit, which also is controlled by Mr. Tran, they explain the history of how they came into ownership of similar shrimp processing equipment. They explain the process of the bank loans. They explain how the payments were made. They explain the timeline of when the equipment was brought into the plant. And, of course, they're in the best position to know all that because they're going to have the information of when they would have purchased machinery had it actually been brought into the facility. None of that was presented here. It's just a bare allegation that equipment is owned and a photograph is provided. And I'll point you to the Alliance claim where Alliance has defrauded the program of over $2 million for a fugitive who's now in Vietnam who never operated on this property, and he's got pictures of shrimp processing equipment in his affidavit. So anyone can have a picture of a piece of shrimp processing equipment. We know that the shrimp processing equipment in the photograph isn't owned by Lot Inc. I don't know who owns that equipment. There's nothing in that photograph that tells you anything about who the title is. It's... Well, the program had investigators from one of their investigative arms, the hub company, go out to verify that the physical equipment was actually in the building. So they saw the equipment, but seeing the equipment, again, doesn't give you any information as to who the owner of the equipment is. That's going to be... The buildings are owned by Lot, right? The buildings are owned by Lot, yes. And when Lot leased the buildings to the Floortec company immediately before and immediately after the oil spill, they leased it with all the equipment inside the building. So Lot was able to make a commercial transaction where they entered into an agreement with another company and said, use all the equipment in the building. If the equipment is, in fact, Crystal's equipment, how were they able to enter into that agreement? They allowed another company to use Crystal's equipment. There's nothing in the record that would indicate that Crystal entered any type of objection. That would show the equipment was still present. It wasn't liquidated. In that time period, who owns the equipment? We don't know who owns the equipment, no. That's absolutely correct. Grant says Crystal still owns it. And I'm looking at paragraph 10. He goes into a lot of detail. Maybe it's contradicted by other things in the record, but he says a $575,000 investment, it all remains on site, owned by Crystal, top quality. Right. And that paragraph stands in contrast to what's in their income tax return that says that they disposed of it in 2010. And it stands in contrast to when Tran presented an affidavit for a lot that said here's the bank that we purchased the equipment from. Here are copies of the promissory notes. This is supposedly a half a million dollar piece of investment. There's no way that there's a commercial transaction like this that takes place that is not documented by somebody besides Crystal that they could obtain a copy of that documentation from. They did it in the lot case. So procedurally, if Crystal wins and it's reversed and remanded, what's it remanded for if there's no procedure for having an evidentiary hearing before Judge Barbier? Well, this would be the first time that we're facing this, Your Honor. So if it's remanded, I think that we would go back with Judge Barbier and discuss what procedure he wanted to follow on this. This is a serious case. This is over a million dollars. And when you look at the totality of what Judge Barbier pointed to, it certainly appears that he's correct that there's fraud in this claim. So to just say that we would ignore this I think would be a very difficult decision. This is a lot of money. Thank you. Oh, no. Mr. Stanley? He's going to speak on the issues of the alter ego of the company. Okay. Good afternoon, Your Honors. I'm here to talk about piercing the corporate veil and I realize I only have a few minutes so I'll be as quick and to the point as I can be. First, I think it is correct that Crystal has no standing to raise this argument. Victor Tran and Christopher Tran did not attempt to intervene and did not attempt to appeal the judgment entered against them. And the law is well settled in this circuit that Crystal would have no standing to make their arguments for them. You cannot appear and champion the rights of another. So for whatever its worth, I think the judgments against those two individuals are not properly argued by Crystal who, in fact, would be to their benefit to have someone other than themselves as a corporate entity libel with them for the judgment. Stepping beyond standing on the merits themselves, first I would like to say the judge had a lot of evidence if you look at what was before him in the district court on facts that would support his piercing the corporate veil. You had two claimant companies, each owned by a different Tran brother, making a claim that they were seafood processors at the precise same physical address. In fact, the claims are remarkably similar. However, neither of them, neither of them bought or processed any shrimp after April of 2009. The oil spill with BP occurs a year later. Yet both of these Tran companies say, we are active seafood processors and we're entitled to money. One went to prison, right? One of them, Victor Tran went to prison and Vin Tran is in Vietnam leaving the country to avoid prosecution. So that is the context in which this comes up. Alliance defaults and Judge Barbier doesn't have to make any findings with respect to Alliance. The attorneys representing these two companies immediately forfeit their fees back to the program when they're presented with this evidence. So all we're left with is Crystal and the question is whether or not there should be a veil piercing with Crystal and these two individuals. Well, Mr. Tran's affidavit, Victor Tran's affidavit, he admits that when he got the money from the program, he immediately transfers Crystal's money to Lott. He says it in his affidavit. Why? He just did. When he received rental payments on this equipment from Flortex, none of it got credited to Crystal. When he received money from the shrimp that was sent to coal storage, it was sent to Victor personally. None of it was credited to Crystal. That's all in the district court record and so Judge Barbier was more than justified in piercing the corporate veil and saying the Tran brothers who are associated with this claim, this affidavit, he is the owner. Chris actually submitted the claim to the program. So both of them have touched the claim. Both of them were aware of the district court proceedings because they put affidavits in. Neither chose to intervene or appear. So for that reason, we would ask if you affirm the Crystal judgment, you should also affirm the judgment with respect to corporate veil. All right. Thank you. Ms. Schoen. First, I just would like to say that I agree with Mr. Paul that this is a very serious case and that's why it's concerning that this sort of foreshortens procedure has been used without really the ability for our clients to be able to defend themselves and for the judge to be able to judge the credibility. It's a small business. It's being asked to pay back over a million dollars and they're being accused of criminal fraud that in some of these other cases has led to, you know, investigations and indictments. Is there a criminal procedure pending? Not that I'm aware of, but that's sort of what the process has been in some of these other clawbacks. To clarify just a few points that have been made, the Alliance claim and Vintran, those are completely separate. The only reason that it's even being brought up in this proceeding at all is that Mr. Paul chose to link that claim and the Crystal claim together in the motion that he filed. He filed it as a motion for return of payments against Crystal and Alliance, but they are owned by family members, but they're not, there's nothing about the Alliance claim that's related to the Crystal claim. So whatever happened with his brother has nothing to do with this claim. In terms of some of the other, you know, purported intermingling, these are related companies. I mean, they're owned and run by family members, and with Lott, when the previously, in terms of the piercing, the arguments made that they just made part of the payment from the Crystal claim to Lott, that's not accurate. Lott owns the land, so Crystal would pay rent for the land. By doing things like that, it's actually formalizing the corporate structure, that the entities are paying debts to each other. So what we're dealing with in the Lott affidavit, in terms of the, there's two sets of equipment here, and I think that's probably pretty clear from the briefing, but there's a set of equipment that Titan owned that was sold to Lott, and that's what they're discussing about the affidavit from Christopher Tran that's about how Lott came to own that section of the equipment. The equipment owned by Crystal is separate from that, the Lott affidavit. It was acquired in 2004. So it was acquired quite some time ago. He also attests to the fact that in 2008, most of the documentation at the facility was destroyed by Hurricane Ike. So there are reasons that they don't have the documentation for how Crystal originally acquired the equipment, nor would that be anything that was required for this claim. You don't have, there was no sort of evidence that was needed about how they acquired the equipment. The equipment now has taken on an exaggerated meaning in terms of what are their ongoing operations, and what were they at that time, between May 2010 and December 2011? During that time, then they were still selling shrimp. They had moved their shrimp to cold storage. They were selling shrimp through August of 2010. That's when then the lease ended after the oil spill. So they continued, as I said before, they continued to pay their debts, like fuel that they had purchased for sale to shrimp boats. They continued to pay those debts throughout 2010, 2011, 2012, because they were planning to go back into business processing shrimp actively. The multiple companies that operate there, too, in terms of Titan and Crystal, they're separate processing plants. That's why they filed separate claims. So while there's like a lot of sort of confusion about, you know, who did what, and who owned what when, then this is exactly why it's not an appropriate case to pierce the corporate veil when that same circular evidence is being used. For example, one of the new arguments that they make on appeal in terms of piercing is that supposedly the Crystal paid off loans to shareholders with what they say is the money that they got, that Crystal got, from selling its equipment. We don't know that. That was raised for the first time in the response to the surply with this briefing. So, I mean, there was never even a time in the record when Crystal or its principals could respond to that. So there's a lot of moving parts, and, you know, whether the credibility of those facts and those determinations, there should be more of a process to determine that with live testimony. Who's going to testify if one's in prison and the other one's in Vietnam? The person in Vietnam, again, is unrelated to this claim. He has to do with alliance. And Victor, he was incarcerated. He got out of prison in 2012. So, I mean, he would be able to testify as would his brother, Christopher. So that's just what we would urge is that the court reverses so that at least some of these credibility determinations and factual disputes can be sussed out during a proper procedure for the district court. Thank you, Your Honors. That concludes our argument docket for today. We'll be in recess until 9 o'clock in the morning.